# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

HIGHER SOCIETY OF INDIANA, INC., )
                                              )
        Plaintiff,             )
                                              )
        v.                        )    Cause No. 4:16-cv-43
                                              )
TIPPECANOE COUNTY, INDIANA,  )
                                              )
        Defendant.           )

## **OPINION & ORDER**

The Higher Society of Indiana wants to hold a rally advocating the legalization of marijuana on the steps of the Tippecanoe County Courthouse. It seems like a reasonable place to get the message out since that is the very place where prosecutions for marijuana possession and sale occur. But the County's policy requires events on the courthouse grounds to be "sponsored and prepared by a department or office of county government" and scheduled through the Board of Commissioners. And despite a request, the County has refused to sponsor an event by the Higher Society. The group filed this case and has moved for a preliminary injunction on grounds that the County has used its events policy to discriminate against speakers on the basis of viewpoint in violation of the First Amendment of the U.S. Constitution.

A hearing was held on the motion for preliminary injunction. Although no evidence was offered at the hearing other than the documentary evidence already attached to the briefing, oral argument was held. During its argument, the County candidly admitted that the reason it did not sponsor the Higher Society's rally was

because it didn't agree with the group's message. The County argues that it may engage in viewpoint discrimination because activities and speeches that take place on the courthouse steps are "government speech" that is not entitled to constitutional protection. As a result, the County's position is that it can pick and choose what messages are conveyed from the grounds of the courthouse. For the reasons outlined below, I think that the County's argument stretches the concept of "government speech" to its breaking point, and so the motion for a preliminary injunction will be granted.

**Background**

The Tippecanoe County Courthouse occupies one square city block in downtown Lafayette, Indiana and houses the county's state courts and county offices. (DE 15 at 2, 9; DE 18 at 1–2.) To fully understand this case, one needs to understand the physical layout of the courthouse and the surrounding grounds which are landscaped and include plush greenery, paved paths, several monuments, a fountain, and benches, and all of which are open to and used by the public. (DE 15 at 2–3; DE 18 at 1–2.) The northern entrance is on Main Street and is permanently closed. The southern entrance to the Courthouse is on Columbia Street and is the only entrance for visitors. The eastern entrance is on Fourth Street and is reserved for the transport of prisoners by the Sheriff. The western entrance is on Third Street and is reserved for county employees. The Main Street and Third Street entrances are separated from the sidewalk by a short flight of stairs and are flanked by two larger staircases that rise to balconies overlooking the

street. (*See* DE 15 at 2–3, 16; *see also* DE 18-1 at 13 (showing Third Street entrance).) The Columbia Street entrance is separated from the public sidewalk by three stairs and is similarly flanked by two staircases that rise to a balcony and colonnade. (*See* DE 18-1 at 18; DE 15 at 2–3, 16.)

In 1999, the Tippecanoe County Board of Commissioners voted to change the County's policy on displays and events on government property to ensure that private activities did not disrupt official business and that County property was available for County uses. (DE 15 at 3; DE 18 at 2–3.) Although there's nothing in the record about the extent to which the courthouse grounds were available to the public for protests, rallies, and other events before the policy was changed, it's clear that the County intended the courthouse grounds to be a "nonpublic forum" moving forward, which is to say an area where the government may impose restrictions on speech or even ban expressive activities, so long as it doesn't discriminate on the basis of viewpoint. (*See* DE 2-2.) Here's what the revised policy, which remains in effect today, says:

### POLICY ON DISPLAYS AND EVENTS ON GOVERNMENT PROPERTY (CLOSED FORUM)

> Only displays and events sponsored and prepared by a department or office of county government will be allowed in the windows of the Tippecanoe County Office Building or on the grounds of the Tippecanoe County Courthouse. Said displays and events shall be scheduled through the Board of Commissioners of the County of Tippecanoe.

(DE 15 at 3; DE 18-1 at 19.)

Under this policy, any group that wishes to hold an event on the courthouse grounds must solicit the support of a commissioner, who then must request sponsorship by the full County board. (*See* DE 18 at 4; DE 15 at 8.) The County's professed aim is to restrict the use of courthouse property to "private groups that are in essence echoing the views of the government agency that is sponsoring them." (*See* DE 18 at 4 (internal quotation marks and citations omitted).) This is a rather curious claim in light of the fact that the County does not inquire into the content of the messages the group would convey before deciding whether to sponsor an event, and there's nothing to suggest that the County in any way controls what a group says once an event is sponsored.

*County-Sponsored Events*

Since the policy change, the County has continued to allow ostensibly private events to take place on courthouse grounds. For example, soon after changing the policy, the County passed a resolution permitting the Round the Fountain Art Fair to be held annually on the courthouse grounds. (DE 15-1 at 6; DE 15 at 5.) Although the fair's name suggests it is confined to an area surrounding a fountain in the northeast corner of the block, it actually takes place across the courthouse grounds and on the surrounding sidewalks and streets. (*See* DE 15 at 5.) Consistent with the County's sponsorship of the fair, County commissioners and maintenance department help with preparations and handle logistics for the fair. (*Id.*; DE 15-1 at 6.)

The County also has sponsored other events by private groups on the courthouse

4

grounds. For example, in 2015, the County board authorized the League of Women Voters to hold a rally celebrating its 95th anniversary on one staircase, the balcony, and the plaza outside the Fourth Street entrance. (DE 18 at 3; DE 18-1 at 42–45.) That rally, which attracted approximately 100 people, was held on a weekday, just after the close of business. (*Id.*) Similarly, the County sponsored a rally by the Fraternal Order of Police in 2014. (DE 18-1 at 46–48.) The FOP rally took place at lunchtime on a weekday on the Main Street entrance stairs. (*See id.*) Neither the League of Women Voters nor the FOP's sponsorship agreement with the County board included any specifics about the messages that would be conveyed at those events. (*See generally* DE 18-1 at 42–48.)

*Private Events Held Without Permission*

In addition to County-sponsored events, other private groups have held events on the courthouse steps without County permission. For example, in 2015, a group called Eyes on Lafayette requested authorization to hold a candlelight vigil against bullying on the courthouse steps. (DE 15-2 at 14–15.) A County employee responded that, while it was too late to get County sponsorship and approval, the event could be held on the sidewalk surrounding the courthouse without permission. (*Id.* at 14.) The vigil was held a few days later in the evening, and the group made use of the courthouse steps in addition to the sidewalk. (DE 15-4 at 2–5 (reproducing pictures from D. Peers McCoy, *Lafayette Crowd Remembers Bullying Victims*, Lafayette J. & Courier, June 5, 2015, www.jconline.com/story/news/education/2015/06/04/lafayette-crowd-remembers-bullying-victims/28517089/).) It was reported that more than 50 people

attended that event. *Id.*

In other cases, the group holding the event decided that its easier to beg for forgiveness than ask for permission. They simply held their event without soliciting County permission, and the County became aware that the event was held on the courthouse grounds only after the fact. (*See* DE 18 at 5.) That was the case on Monday, September 28, 2015, when Planned Parenthood held a daytime rally, which was attended by approximately 60 people, on the stairs and adjacent sidewalk outside the visitors' entrance on Columbia Street. (*See* DE 15 at 6; *see also Dozens Rally in Pink to Stand with Planned Parenthood*, WLFI News, Sept. 29, 2015, http://wlfi.com/2015/09/29 /dozens-rally-in-pink-to-stand-with-planned- parenthood/. Similarly, approximately 70 people attended a daytime march in support of Syrian refugees and against Governor Pence's attempted ban on the resettlement of refugees in Indiana on a weekday in 2015, and that event spilled over onto the courthouse steps from the sidewalk. (*See* DE 15 at 6; *see also PHOTOS: Protestors Rally Against Syrian Refugee Ban*, Lafayette Journal & Courier, Dec. 4, 2015, http://www.jconline.com/picture-gallery/ news/2015/12/04/photos-protesters-rally-against-syrian-refugee-ban/76801556/.)

*Higher Society's Rallies*

The rally the Higher Society wants to hold would be its second on the Tippecanoe County Courthouse grounds. The first was held on Wednesday, May 11, 2016, during business hours just outside and above the employee entrance on Third Street. (*See* DE 15 at 7; DE 8-1 at 1–2.) Although a County employee told the group that

they could hold the rally, she mistakenly believed that the event had been approved by the County board. (DE 8-1 at 2.) At the event, speakers at a podium on the balcony above the door to the courthouse addressed a crowd of up to 40 people that had gathered below. (DE 9 at 3; *see also* DE 15 at 7.) Banners and signs hung from the balcony, and the speeches and music were amplified, until a commissioner asked the group to turn the amplifier off. (DE 9 at 3.)

After that first rally, the Higher Society asked the County for permission to hold a second rally on the courthouse steps, this time without an amplification system, but the County denied the request, on grounds that "[n]one of the Commissioners has indicated an intent to recommend sponsoring the event to the full Board" and seemingly because of the County board's 1999 decision to designate the courthouse grounds a "closed forum."(DE 2-2; *see also* DE 2-1 at 1.)

The County's refusal sparked the current controversy in which Higher Society seeks a preliminary injunction. The County's response brief argued both that speech on the courthouse steps is government speech that the County can constitutionally control and that the courthouse grounds are a "nonpublic forum" that can be regulated, so long as there is no viewpoint discrimination. (DE 15 at 9, 13–16.) But as I mentioned above, the County conceded at oral argument that its denial of the Higher Society's request was "not viewpoint neutral"—which means that, if the courthouse grounds are a nonpublic forum, the County acted unconstitutionally. Based on that concession, it is unnecessary to address the County's first argument, and so I will focus my attention on

7

the County's sole remaining argument: that the County's viewpoint discrimination was not unconstitutional because speech on the courthouse steps is government speech that is not protected by the First Amendment.

## Discussion

The Higher Society wants a preliminary injunction so that it can hold another rally before this case is fully resolved. Let's start with the basics. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a party must make a threshold showing that it (1) is likely to succeed on the merits; (2) will suffer irreparable harm will result if the injunction is denied; and (3) has no adequate remedy at law. *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011).

There is no question that the second and third requirements for a preliminary injunction are satisfied here because "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate[.]" *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *accord MacDonald v. Chicago Park Dist.,* 132 F.3d 355, 358 (7th Cir. 1997) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The only real question at this threshold stage, then, is whether the Higher Society is likely to prevail on the merits of its claim that the County violated its First Amendment rights by denying the request for a second rally.

Because the County admits to viewpoint discrimination that would violate the First Amendment even in the most restrictive of the government-created forums for

8

speech, there is no need to do a traditional forum analysis here. *See generally Anderson v. Milwaukee Cnty.*, 433 F.3d 975, 979–80 (7th Cir. 2006); *Ill. Dunesland Preser. Soc'y v. Ill. Dep't of Natural Res.*, 584 F.3d 719, 724–25 (7th Cir. 2009). Instead, the question is whether speech on the Tippecanoe County Courthouse stairs has been confined to speech by the County government itself, albeit through private speakers. If it has, then the County "is entitled to promote a program, to espouse a policy, or to take a position," and in doing so, may decide which speakers to sponsor and which to turn away on the basis of viewpoint without violating the First Amendment. *Walker v. Tex. Div., Sons of Confed. Vets., Inc.*, 135 S. Ct. 2239, 2245 (2015) (citing *Pleasant Grove City, Utah v. Summun*, 555 U.S. 460, 467–68 (2009)).

*Summun* is the leading case on government speech. 555 U.S. 460. There, a religious organization sued a town for denying its request to erect a permanent monument in a park where the city had permitted other groups to erect religious monuments. (*Id.* at 464.) The U.S. Supreme Court rejected the argument that monuments erected in a public park are like "speeches and other transitory expressive acts" for First Amendment purposes because, while "public parks can accommodate only a limited number of permanent monuments," other government-owned property is "capable of accommodating a large number of public speakers without defeating the essential function of the land[.]" (*Id.* at 464, 478–79.) Rather, the Court concluded that the monuments were government speech that could be regulated (or banned) based on content and viewpoint. (*Id.* at 467–68 (internal citations omitted).)

9

The U.S. Supreme Court further delineated what kinds of expressive activities constitute government speech in *Walker,* 135 S. Ct. 2239. There, the Texas Department of Motor Vehicles had a program whereby private citizens and groups could propose alternative license plate designs. *Id.* at 2244–45. The Sons of Confederate Veterans applied for a specialty license plate featuring a Confederate flag, but the DMV denied the request, which led the group to sue on First Amendment grounds. *Id.* The *Walker* court applied *Summun* and concluded that Texas's license plates were not a public forum entitled to Free Speech protections, but instead government speech. *Id.* at 2248. In doing so, the Court clarified the following markers of government speech made by or with the help of a private speaker: (1) there is a history of the government using the forum to speak to the public; (2) observers of speech in that forum "routinely — and reasonably — interpret [it] as conveying some message" on behalf of the government because the forum is not usually opened up to messages with which the government disagrees; and (3) the government maintains control over the message to be conveyed. *Id* at 2247–49 (internal quotation marks and brackets omitted).

Applying those factors here leads to the conclusion that the rallies, protests, and other events that have happened on the Tippecanoe County Courthouse steps are not government speech. First, the County pointed to no evidence indicating that the courthouse stairs are a forum that the government has historically used to convey its own messages. To the contrary, prior to 1999, the courthouse stairs appear to have been used by groups for expressive activity, and, even after the policy change, private groups

continue to use the stairs, whether they have the County's permission (e.g., the Fraternal Order of Police) or not (e.g., Planned Parenthood).

Second, passersby who see protests, speakers, rallies, and the like on the Tippecanoe Courthouse steps are unlikely to interpret them as conveying a message *on behalf of Tippecanoe County*. That's both because private groups historically have held events on the courthouse grounds and continue to have them—with or without County approval—and because rallies and protests outside the courthouse are not a usual mechanism for speech by the government. And more generally, no one who happens upon a protest on public property would think that the government necessarily supports the message being conveyed. Rather, reasonable observers know that people who want to protest will find symbolic public property to do it on, and that, in many cases, the First Amendment guarantees them the right to march peacefully and make speeches there, even if the government doesn't like what they are saying. In other words, reasonable people instinctively know the difference between the government allowing people to speak on its property, on the one hand, and supporting the message being conveyed, on the other.

More permanent forms of speech like monuments and license plates are a horse of a different color. As the Supreme Court recognized in *Summun*, speeches and protests are fleeting; monuments and license plates, by contrast, are more permanent. 555 U.S. at 479. Observers of these permanent types of speech would be reasonable to conclude that the government supports the monument's message because, otherwise, it would

not have permitted the monument to be placed permanently on its land. Not so with a speaker. It is this distinction that explains cases like *Walker* and *Summun*.

Third, activities held on the Tippecanoe Courthouse steps by private groups are not government speech because Tippecanoe County exercises very little (if any) control over the messages conveyed there. The County's stock sponsorship agreement doesn't even require information about the subject matter of the event. (*See, e.g.*, DE 23-2 at 9–11.) While the message is likely obvious in certain cases (as it is with the Higher Society), in others the County has no idea what the group intends to say. Take the Round the Fountain Art Fair, as an example. That event, which features the artwork of many different artists, has been sponsored by the County on a permanent basis, but there's no evidence suggesting that the County has ever reviewed or approved the artwork that will be displayed at the fair. A participating artist could use her work to rail against an official County policy, speech that would be clearly inconsistent with the County's viewpoint, and the County wouldn't learn of it until it's said and done. I don't see how that speech—speech that is "sponsored" by the County in name but the content of which is never reviewed or approved by the County—can be reasonably characterized as "government speech."

Nor does Tippecanoe exercise control over the messages professed by the groups that receive ad hoc sponsorship. The League of Women Voters applied for and was granted County sponsorship for an event in 2015, yet its sponsorship agreement with the County was silent about content and instead vaguely stated that the group "would

12

like to conduct a "[r]ally on the courthouse steps with short speeches, proclamations, [and] singing to celebrate the 95th Anniversary of the League of Women Voters." (*See* DE 18-1 at 42.) The agreement did not disclose—and nothing suggests the County ever separately asked—whether the group would express any of its more controversial views during the event, such as positions on voter restrictions and abortion access. *See id.; see also, e.g.*, League of Women Voters, *Status of Women in the States: 2015, Reproductive Rights*, http://leaguelafayette. org/files/status_of_ women_reproductive-rights_2015. pdf. The sponsorship agreement also did not reserve the County's right to review or approve the language that would be used at the event. (*See generally* DE 18-1 at 42–45.)

Similarly, the Fraternal Order of the Police applied and was granted sponsorship for a memorial service on the courthouse steps in 2015 (DE 18-1 at 46–48), but the group never said and seemingly was never asked whether the event would involve conveying the message that "Blue lives matter," a political viewpoint that the FOP has espoused elsewhere. *See id.; see also, e.g.*, C. Canterbury, *Letter to U.S. Rep. K. Buck*, Mar. 18, 2016, https://fop.net/CmsDocument/Doc/ltr _2016-0318.pdf (expressing "strong support" for legislation that has come to be known as the Blue Lives Matter Act of 2016). As with the other sponsored events, the sponsorship agreement did not reserve the County's right to review or approve the group's message. (*See generally* DE 18-1 at 46–48.)

What's more, the County has exercised even less control over events that do not go through the County board before they are held on the courthouse steps. For

13

example, the County knew about but didn't have time to sponsor an anti-bullying event held by Eyes on Lafayette in June 2015. (DE 15-2 at 15.) In that case, the vigil was held in the evening, and, while it may have begun on the sidewalk, the group ultimately made use of the courthouse steps. (DE 15-4 at 2–5.) Similarly, both Planned Parenthood and a group protesting against Indiana Governor Pence's attempt to ban Syrian refugees from resettling in Indiana held events that made partial use of the courthouse steps, and they did so without advance permission from the County. (DE 15 at 6.) Although the County claims that the use of the courthouse grounds in those cases was incidental and unauthorized, news reporting of those events shows that attendees made significant use of courthouse property. *See, e.g.,* Peers McCoy, *Lafayette Crowd Remembers Bullying Victims*, Lafayette J. & Courier, June 5, 2015, www.jconline.com/story/news/ education/2015/06/04/lafayette-crowd-remembers-bullying-victims/ 28517089/ (showing 30 or more people on the courthouse stairs during the event); *Dozens Rally in Pink to Stand with Planned Parenthood*, WLFI News, Sept. 29, 2015, http://wlfi.com/ 2015/09/29/dozens-rally-in-pink-to-stand-with-planned-parenthood/ (video showing more than 20 people on the courthouse stairs during the event).

Regardless of whether a group asked for advance permission or not, Tippecanoe County did not review the messages that would be conveyed during the events to weed out those that were overtly partisan or were not shared by the powers that be in the County. The League of Women Voters or Planned Parenthood could have used the courthouse stairs to shout "Voter restrictions are racist!"; the FOP could chant their now

14

oft-repeated mantra that "Blue lives matter!"; and protestors could have used the stairs to scream "Out with Governor Pence! In with the Syrian refugees!" And for all the County knows, they did.

This is in direct contrast to the control of message one sees in the line of government speech cases relied upon by the County. In *Walker*, Texas reviewed and formally approved the final design of each specialty license plate. 135 S. Ct. at 2247. In *Summun*, Pleasant Grove City "effectively controlled" the messages on permanent monuments by exercising "final approval authority" over their selection. 555 U.S. at 473 (quoting *Johanns v. Livestock Mrktg. Ass'n*, 544 U.S. 550, 560–61 (2004)). And, in *Illinois Dunesland Preservation Society*, a state employee selected brochures that would attract tourists to a state park for showcasing in display racks at the park. 584 F.3d at 724.

In short, the speech that takes place on the Tippecanoe County Courthouse stairs doesn't have the features of government speech. Rather, the County has opened the courthouse grounds up to speech by some groups—the ones it likes—and, having done so, it may not now prohibit others from speaking on the basis of what they intend to say. Accordingly, the Higher Society has shown that it has a significant likelihood of success on the merits, and it has made a threshold showing that it is entitled to a preliminary injunction.

***Balances of Harms & Public Interest***

The next stage in the preliminary injunction analysis is to balance the relative harms that could be caused to either party if an injunction is granted or denied and to

weigh the public interest. *Winter*, 555 U.S. at 24. The balancing of harms is done on a sliding sale, which is to say that "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side[.]" *Planned Parenthood of Wisc., Inc. v. Van Hollen,* 738 F.3d 786, 795 (7th Cir. 2013) (internal quotation marks and citations omitted).

Here, the Higher Society has shown a strong likelihood of success and so it doesn't have to show that the balance of harms tips heavily in its favor. Nevertheless, it is clear that the balance of harms weighs strongly in favor of the Higher Society because "the loss of the First Amendment right to speak and associate, even for a short period of time, will necessarily give rise to an irreparable injury." *See MacDonald,* 132 F.3d at 358; *see also* DE 15 at 17. The only possible harm on the other side of the scale is a loss of "order and decorum at the Tippecanoe County Courthouse." (*See* DE 15 at 17.) Frankly, that seems unlikely to happen, given that the Higher Society's last rally was not disruptive and that the County would be able to continue regulating events so that they don't interfere with courthouse business and in order to ration the use of a limited amount of space. *See generally Women's Health Link,* 2016 WL 3435633; *see also MacDonald v. City of Chicago,* 243 F.3d 1021, 1032 (7th Cir. 2001) (holding that time, place, and manner restrictions are constitutional so long as they are viewpoint neutral, narrowly tailored, and leave open sufficient alternative mans of communication).

When you add to this calculation the fact that an injunction protecting First Amendment rights is always in the public interest, *see Christian Legal Soc'y,* 453 F.3d at

16

859, what you end up with is the conclusion that the Higher Society is entitled to a preliminary injunction.

**Conclusion**

Accordingly, the motion to for preliminary injunction (DE 8) is **GRANTED**, and Tippecanoe County, Indiana is **ENJOINED** from enforcing its Policy on Displays and Events on Government Property to prevent the Higher Society from holding future rallies on the courthouse steps.

**SO ORDERED.**

ENTERED: December 19, 2016.

s/ Philip P. Simon  
CHIEF JUDGE  
UNITED STATES DISTRICT COURT